UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**RAMON SATYENDRA**,

      Plaintiff,                                Case No. 5:25-cv-12973

v.

**UNIVERSITY OF MICHIGAN; and**
**UNIVERSITY OF MICHIGAN**
**BOARD OF REGENTS**;

      Defendants.
_____

SALVATORE PRESCOTT
PORTER & PORTER PLLC
Hideaki Sano (P61877)
105 E. Main Street
Northville, Michigan  48167
(248) 679-8711
sano@sppplaw.com
*Attorney for Plaintiff*
_____

**COMPLAINT AND JURY DEMAND**

Plaintiff Ramon Satyendra by and through his attorneys, SALVATORE PRESCOTT PORTER & PORTER, submits this Complaint and states as follows:

1

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Ramon Satyendra is a resident of Ann Arbor, Michigan, which is within the Eastern District of Michigan.

2. Defendant University of Michigan is a public university.

3. Defendant Board of Regents of University of Michigan is the publicly elected body that has general supervision of the University of Michigan. The University of Michigan and its Regents are collectively referred to herein as the "University."

4. Claims in this action are for retaliation in violation of Title VII of the Civil Rights Act of 1964 and for violation of the Americans with Disabilities Act, 42 USC 12101 et seq.

5. Plaintiff filed a charge with the EEOC for discrimination, retaliation, and disability discrimination in February of 2024. Plaintiff received a right-to-sue letter on June 23, 2025.

6. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

## GENERAL ALLEGATIONS

7. Professor Satyendra was an Associate Professor (with tenure) in the Music Theory Department of the University of Michigan School of Music, Theater, & Dance ("SMTD").

8. Professor Satyendra had been a member of the faculty since approximately 2001. Professor Satyendra is a minority male.

9. Professor Satyendra had served in various capacities during his tenure at the University, including as Chair of the Music Theory Department and as a member of Executive Committee of SMTD.

10. Professor Satyendra was a highly regarded and popular Professor at SMTD.

***Professor Satyendra observes and reports potential events of discrimination.***

11. During his tenure at SMTD, Professor Satyendra had on occasions observed and experienced actions that raised concerns about potential racial discrimination, including actions by administrators and professors in the Music Theory Department.

12. But in late 2020, he became concerned about a group of white professors in the Music Theory Department, that appeared to be taking actions that had a discriminatory impact. As just a few examples:

   a. a prominent minority, male faculty member was denied tenure in a manner that appeared to be manipulated by hostile white faculty in the department;

   b. the white chair of the Department announced that her DEI strategy would center on a newly hired white professor teaching DEI courses;

   c. the white chair of the Department appeared to have manipulated Professor

    Satyendra and another minority professor off of a hiring committee and formed an all-white hiring committee;

d. the same white chair began favoring white faculty and excluding minority faculty from favorable course selections, for example, teaching anti-racism courses;

e. the same white chair wrote a DEI report that focused on white professors in the Department, and marginalized minority professors, including Professor Satyendra who was not even mentioned in the report;

f. the white faculty would support each other – and not involve minority faculty – for example, in one case nominating a white male faculty for an MLK Spirit Award, while ignoring minority professors who had made significant DEI contributions.

13. Professor Satyendra initially attempted to raise these concerns with the then Vice Provost and Chief Diversity Officer, Faculty Ombuds and OIE, but was seeking a mediated intervention. Given Professor Satyendra's concerns about retaliation, the Vice Provost notified the Dean of SMTD, Dean Gier, of the minority concerns in the Music Theory Department without mentioning Professor Satyendra's name.

14. Thereafter, the white Chair of the Department engaged in various actions that were discriminatory. Examples include refusing to respond to Professor

4

Satyendra about his teaching assignment or teaching assignment policies, excluding Professor Satyendra from faculty discussions (and, indeed, refraining from interacting with him except when absolutely necessary), refusing to respond or even refer to Professor Satyendra by name until, after he raised the issue, responding to Professor Satyendra in a hostile manner; and even giving him an unpleasant look on the rare occasion they personally interacted.

15. Thereafter, the white Chair of the Department became aware of Professor Satyendra's complaint that she was engaged in racially discriminatory actions against him. Thereafter, the white Chair of the Department began retaliating against Professor Satyendra. Among other actions, she publicly "outed" him at a faculty meeting by attacking him for having made the complaint against her and then attacking Professor Satyendra's character by attacking the veracity of the complaint and providing him a negative performance review – his first such negative review in his time at SMTD.

16. Notably, Professor Satyendra attempted to report various events to administrators at SMTD and the University, but neither credited his complaints nor expressed concerns about the actions of his white Department chair. Indeed, at one point, when Professor Satyendra noted that his white Department chair was treating him in a manner that was excluding him from exercising his faculty rights and violated SMTD's written policy, rather than enforce the written policy, SMTD

asserted that some vague past practice overruled the written policy and supported her actions and ultimately changed the written policy to validate her improper actions.

17. The stress caused by the hostile environment and the refusal of SMTD or the University to take any actions caused Professor Satyendra to suffer material psychological harm that interfered with his ability to perform his job duties.

18. Professor Satyendra finally filed a complaint with ECRT. ECRT conducted an investigation and determined that the white Chair of his Department had in fact retaliated against him. Moreover, although ECRT did not find sufficient evidence to support a finding of discrimination based on race, it did note that the behavior of the white Department chair was problematic and not consistent with the values and expectations of individuals serving in leadership positions at the University.

19. Despite the findings of retaliation and "problematic" conduct, the University and SMTD continue to provide little more than lip service in terms of Professor Satyendra's concerns regarding future retaliation, again resulting in material harm to him.

20. Professor Satyendra filed a charge with the EEOC on or about September of 2021.

21. Professor Satyendra received his right to sue letter from the EEOC on

or about May 19, 2023.  He thereafter filed a complaint alleging discrimination and retaliation under Title VII by the University and various administrators.

***Professor Satyendra retires under duress.***

22. Professor Satyendra was approved for a medical leave due to the stress and related medical consequences of the discrimination and retaliation.  The leave continued through the summer of 2023.  But Professor Satyendra's condition had improved some and he wanted to return to work, and thought that he might be able to safely return to work given what he anticipated would be the University's reaction to the investigators' findings that his former department Chair had improperly retaliated against him.

23. Professor Satyendra reached out to the Dean of SMTD to determine what measures he might implement to protect Professor Satyendra from further retaliation, particularly by the former department Chair.  The Dean indicated that he had provided training, that there were windows in doors, and told him that he could report any retaliation concerns to ECRT.  During this period, Professor Satyendra's improvement began to regress, which his treating physician documented in a treatment note.

24. Professor Satyendra consulted with his treating physician to determine if these accommodations were sufficient protections for him to return to work.

25. Around this time in August 2023, a colleague reached out wondering if

Professor Satyendra was leaving the school because SMTD had taken his nameplate off his office door – this had never happened previously.

26. Professor Satyendra's physician provided a document to the University of Michigan Work Connections ("Work Connections"), the University's disability administrator, that listed some proposed accommodations that might allow Professor Satyendra return to work (he wanted to see how Professor Satyendra reacted).

27. Work Connections and SMTD both seemed to indicate that Professor Satyendra should take up the issue of accommodations with the other. During this period, SMTD indicated that Professor Satyendra could not return to work until Work Connections cleared him to return.

28. At the same time, Work Connections closed Professor Satyendra's case file and indicated that he had to look elsewhere to determine if the requested accommodations could be implemented, but that if he submitted additional information, Work Connections would reopen his case.

29. In the context of these discussions, Work Connections referenced something that caused Professor Satyendra to refer to the ECRT finding of retaliation. Thereafter, the Work Connections representative became hostile.

30. By this point, Professor Satyendra's physician determined that Professor Satyendra's condition had regressed and deteriorated sufficiently, so that he would no longer be able to work, even with accommodations, and insisted that

Professor Satyendra extend his leave.

31. But when Professor Satyendra submitted his doctor's note to Work Connections, Work Connections claimed that the note did not support further leave (even though his note indicated that his condition had worsened and that the accommodations would no longer be sufficient). Work Connections then suddenly began questioning the credibility of his treating physician (an issue that had never previously arisen), including by suggesting that Professor Satyendra's condition had not actually worsened.

32. Work Connections thereafter demanded that Professor Satyendra undergo an Independent Medical Exam ("IME"). Work Connections appeared to provide differing explanations for why it needed to conduct the IME.

33. It was also communicated to Professor Satyendra that if the IME doctor did not support Professor Satyendra's need for leave, then he would have to pay back salary and insurance premiums. Around this same time, a University HR administrator confirmed that if Professor Satyendra retired, he would be able to avoid these financial consequences.

34. Professor Satyendra was concerned about Work Connections's motives in compelling him to undergo the IME, but under the circumstances, had no choice but to agree. His concerns increased when he noted that the IME physicians listed by Work Connections did not have expertise to diagnose his medical condition.

When he raised this issue, Work Connections refused to address it and simply directed him to undergo the IME. Professor Satyendra complied.

35. Unsurprisingly, the IME physician failed to diagnose any condition that would support Professor Satyendra's leave. At the same time, the IME physician admitted that Professor Satyendra did appear to have a neurological condition, but also stated that he (the IME physician) lacked the expertise to diagnose the condition. Based on this record, Work Connections indicated that Professor Satyendra would need to return to work immediately. This also meant that he would need to repay his salary and benefits.

36. Given his treating physician directive that he not return to work, and faced with the financial consequences of the negative determination, Professor Satyendra had no choice but to agree to involuntarily retire under duress. Professor Satyendra was constructively terminated as of December 31, 2023.

37. Professor Satyendra filed a charge with the EEOC related to his forced retirement on or about February of 2024.

38. Professor Satyendra received his right to sue letter from the EEOC on or about June 23, 2025.

## COUNT I
## TITLE VII – RETALIATION

39. Plaintiff hereby incorporates all preceding paragraphs.

40. Plaintiff engaged in protected conduct when he complained of race discrimination and retaliation to the University, and thereafter filed a charge with the EEOC and a federal lawsuit seeking to protect his rights under Title VII.

41. Various administrators at SMTD and at Work Connections were aware of his complaints.

42. The administrators at SMTD and at Work Connections took adverse actions against Plaintiff because of his protected complaints of discrimination as described above.

43. Plaintiff's protected conduct motivated the retaliation.

44. The retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiffs' rights.

45. As a result of Defendant's conduct, Plaintiff was harmed and continues to be harmed.

## COUNT II
## VIOLATION OF THE AMERICAN WITH DISABILITIES ACT

46. Plaintiff hereby incorporates all preceding paragraphs.

47. Plaintiff is individual with a disability that substantially limits one or more of his major life activities, and is disabled within the meaning of the ADA.

48. Plaintiff is a qualified individual who was able to perform the essential functions of his job with reasonable accommodations, including but not limited to medical leaves that did not impose an undue hardship on Defendants.

49. Defendants discriminated against Defendants by denying him reasonable accommodations, failing to engage in the interactive process with him in good faith, and refusing to grant him leave to which he was legally entitled, and by constructively terminating Plaintiff because of his disability.

50. Defendants acted with malice or reckless indifference to Plaintiff's rights.

51. As a result of Defendants' conduct, Plaintiff was harmed and continues to be harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants as follows:

a. economic and non-economic damages;

b. emotional distress damages;

c. attorney fees and costs;

d. punitive damages; and

e. all other legal and equitable relief determined by the Court to be appropriate.

        Respectfully Submitted,

        <u>/s/ Hideaki Sano</u>
        Hideaki Sano (P61877)
        SALVATORE PRESCOTT
        PORTER & PORTER, PLLC
        *Attorneys for Plaintiff*
        105 East Main Street
        Northville, MI 48167
        (248) 679-8711
        sano@spplaw.com

Dated:  September 19, 2025

## **JURY DEMAND**

Plaintiff demands a trial by jury in the above-captioned matter.

Respectfully Submitted,

Dated:	September 19, 2025

/s/ Hideaki Sano
Hideaki Sano (P61877)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
sano@spplaw.com